IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

C.D. by and through his Parent and Legal Guardian,      :
VALERIE SCHALK-DAY,                                     :
                                                        :
              Plaintiff,                                :
                                                        :
v.                                                      :        Case No. XXXX-XX
                                                        :
THE SCHOOL BOARD OF FAIRFAX COUNTY,                     :
                                                        :
                                                        :
              Defendant.                                :
                                                        :

## **COMPLAINT**

### I. **Preliminary Statement**

1. This action is brought by Conrad Day ("C.D.") and his Parent, Valerie Schalk-Day (collectively, "Plaintiff" or "Parent"). C.D. is a 20-year-old student at the Devereaux Glenholme School ("Glenholme") in Washington, CT, with the following diagnoses:

- Autism Spectrum Disorder;
- Attention Deficit Hyperactivity Disorder ("ADHD");
- Other Specific Neurodevelopmental Disorder (due to documented deficits in executive functioning);
- Language Disorder (resulting in deficits in verbal sequencing, auditory working memory span and oral pragmatics);
- Auditory Processing Disorder;
- Disruptive Mood Dysregulation Disorder;
- Depression;
- General Anxiety Disorder;
- Bi-Polar Disorder;
- Dyslexia;
- Phonological Disorder;
- Feeding Difficulties;
- Dysphagia-Oral Phase;
- Ankloglossia – Posterior Tongue Tie;
- Other Dentofacial Anomalies – Malocclusion due to MYO;
- Other Dentofacial Anomalies – Forward Swallow Pattern;
- High Dental Arch due to MYO.

(Tr. 188-95; 170:5-10; Compl. 12, 14, 32, 33, 34, 35, 77). He was initially found eligible for Special Education and Related Services ("SPED") under the IDEA eligibility category of Autism Spectrum Disorder ("ASD").  He is currently eligible for SPED under the categories of ASD, Specific Learning Disability ("SLD"), Other Health Impairment ("OHI"), and Emotional Disability ("ED"), pursuant to the IDEA.  20 U.S.C. § 1412, *et seq*.

2. This action is an appeal of the Hearing Officer decision in the Special Education Due Process Hearing for C.D. brought under the IDEA.

## II.  Parties

3.  C.D. has at all relevant times been a resident of Fairfax County.

4.  Valerie Schalk-Day is C.D.'s parent and legal guardian and at all relevant times has been a resident of Fairfax County.

5. Defendant, the School Board of Fairfax County, on behalf of Fairfax County Public School ("Defendant" or "FCPS") is located at 8115 Gatehouse Road, Suite 5400, Falls Church, VA 22042. On information and belief, FCPS is the recipient of several sources of federal funds and is a Local Educational Agency ("LEA") designated by Virginia law and the Virginia Department of Education ("VDOE") for the provision of educational services to individuals residing therein.

## III.  Jurisdiction and Venue

6. This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA.

7.  The Plaintiff has exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a Special Education Due Process Hearing, and are an aggrieved party under 20 U.S.C. § 1415(i)(2)(A) and 28 U.S.C. § 1391.

8. All of the Defendant's actions complained of herein have taken place within the jurisdiction of the United States District Court for the Eastern District of Virginia.  Venue is

appropriate in this District pursuant to 28 U.S.C. § 1391.

## IV. Facts

### A. C.D.'s Educational Placement Through The 2015-2016 School Year

9. C.D. is a 20-year-old, special education student attending the Glenholme School in Washington, CT, who is a resident of Fairfax County within the boundaries of FCPS during all relevant time periods.

10. The most recent IDEA eligibility evaluation of C.D. was conducted by FCPS on October 26, 2020. C.D. was found eligible for Special Education and Related Services under the categories of ASD, Specific Learning Disability ("SLD"), and Other Health Impairment ("OHI"), pursuant to the IDEA. 20 U.S.C. § 1412, *et seq*.

11. C.D.'s disabilities include ASD, ADHD, Other Specific Neurodevelopmental Disorder (due to documented deficits in executive functioning), Language Disorder (resulting in deficits in verbal sequencing, auditory working memory span and oral pragmatics), Auditory Processing Disorder, Disruptive Mood Dysregulation, Depression, General Anxiety Disorder, Bipolar Disorder, Dyslexia, Phonological Disorder, Feeding Difficulties, Dysphagia-Oral Phase, Ankloglossia- Posterior Tongue Tie, Malocclusion due to MYO, Forward Swallow Pattern, and High Dental Arch due to MYO.

12. C.D. was identified as a child in need of special services at 3 years of age, when his preschool referred him to Child Find for evaluation. He was recognized as a student with Developmental Delay in his motor skills and a diagnosis of a Pervasive Developmental Delay. He was then diagnosed in his Kindergarten year with Asperger's Disorder. At that time C.D. was a student at St. Mary's, a private day school in Northern Virginia. After only three months, St. Mary's felt that C.D.'s needs were too extensive for them and the Parent transitioned him to FCPS.

13. From there, C.D. attended Washington Mill Elementary School from Kindergarten through the 3rd grade. The concerns of C.D.'s Parent increased as time passed. In addition to

C.D.'s lack of academic progress and other IEP-related concerns, his Parent received almost daily reports of disruptive behavior and others issues from Washington Mill. Following these issues with FCPS, the Parent placed C.D. at the Newton School in 4th grade through 6th grade. Due to his ongoing issues related to his Autism Spectrum Disorder, he was then placed at the Ivymount School, a private special education day school, in July 2013. After attending Ivymount from 7th to 9th grade, the Parent considered returning C.D. to public school, contacted FCPS, and requested a reevaluation of C.D.'s current needs in a letter dated December 16, 2015. (FCPS 8).

14.  The IEP team met numerous times from December 2015 through December 2016. In June 2016, Ivymount School determined that, due to the severity and intensity of C.D.'s needs, they could no longer support him and he needed more intensive programming. Ivymount's clinical psychologist, Dr. Stephen Kane, and C.D.'s private clinical psychologist and psychiatrist recommended a more restrictive placement in a residential program. (Tr. 191:1-191:22; Compl. 103).

15.  The Parent toured Quander Road School during this time. (FCPS 54-002). From the start, FCPS Procedural Support Liaison ("PSL") Sandra Streeter categorically refused to consider the significant documentation shared by the Parent and definitively stated "I know [C.D.]" despite having never taught him or even seen him since the 3rd grade. (Tr. 911:12-22). After a delay of 6 months from the Parent's December 2015 request, FCPS convened an IEP team meeting on June 30, 2016, during which they proposed placement at the Quander Road School without completing evaluations, conducting observations, or determining IEP Eligibility. As stated above, C.D.'s aggression and suicidal ideation were increasing and his overall educational, social-emotional, and psychological functioning were deteriorating. Due to his condition, residential therapeutic placement was strongly recommended in reports by C.D.'s treating specialists, as well as Dr. Kane, clinical director at Ivymount, as stated above. The Ivymount Director of the

Model Asperger Program, Monica Warner, and the Academic Director, Jennifer Engle, recommended residential placement to the Parent to meet C.D.'s educational needs. (Tr. 207:15-217:3; Compl. 116; FCPS 8).

16.  In August 2016, based upon the recommendations of C.D.'s doctors and Ivymount, the Parent submitted a letter indicating their strong disagreement with the proposed placement in Quander Road School and gave timely notice under the IDEA that they intended to enroll C.D. at Little Keswick School ("LKS"), a residential private special education school in Keswick, VA. (Tr. 164:10-165:16; Compl. 115). Throughout C.D.'s enrollment at LKS, the Parent communicated with FCPS and the IEP team on a regular basis, sharing data and information from LKS, private providers, etc., advocating for C.D.'s IEP placement to be changed to LKS. (Tr. 195:11-195:20).

17.  The Reevaluation and Eligibility that the Parent requested in December 2015 was finally completed in December 2016. C.D. was found to continue to be eligible under Autism and Specific Learning Disability, as well as Emotional Disability and Other Health Impairment for ADHD. (FCPS 22).

18.  Previously in the Spring of 2016, the Parent had requested FCPS conduct a Functional Behavioral Analysis ("FBA") to develop a Behavior Intervention Plan ("BIP") due to the highly disruptive and interfering nature of C.D.'s behaviors. This was not conducted until after the Parent sent several communications to PSL Streeter and FCPS reminding them of the request from 2016-2017. An FBA was finally conducted in March 2018, and a BIP was proposed, however it did not address all of C.D.'s significant behaviors, only very narrow behaviors, which LKS, the Parent, and the Parent's experts noted would be inadequate to meet C.D.'s behavioral needs. The BIP was not incorporated into C.D.'s IEP and was never implemented. (Compl. 7, 24-26).

**B. C.D.'s Educational Placement At The Little Keswick School**

19. C.D. attended the Little Keswick School ("LKS") from 2016 through the 2018-2019 school year. LKS is a residential school for boys in grades 4-12 with social and learning differences who are predominantly on the Autism Spectrum. (Tr. 64:2-5). The program at LKS is twofold: residential and academic. (Tr. 60:19-22). While LKS's program provides psychiatric care, they do not provide any medical treatment. LKS works with psychiatrist Dr. Byrnes on an independent contractor basis. ((Tr. 64:8-10; 65:6-15). Dr. Byrnes works with students outside of the classroom for discrete sessions typically on a weekly basis (Tr. 65:10-15). No psychiatric care is administered in the classroom or during the school day at LKS. (Tr. 66:10-11)

20. LKS's academic programming involves the use of specific and directed special education support provided on a consistent basis by a single classroom instructor, aide, and related service providers. (Tr. 67:2-20). LKS's curriculum follows the aligned standards as established by the Virginia Department of Education ("VDOE") and it is a properly accredited special education program through the VDOE. (Tr. 64:14-65:5). In addition to their academics, LKS also employs a "social curriculum" imbedded into their program with the assistance of a speech language pathologist who works with students on one-to-one, small group, and whole classroom exercises. (Tr. 99:9-18).

21. Due to the severity, frequency, and duration of C.D.'s behaviors and other manifestations of his disability, C.D. was provided a very high level of support and services at LKS. These behaviors included aggressive behaviors that were an imminent threat of harm to himself and/or others which necessitated the use of restraint techniques. (Tr. 146:6-21). These behaviors included punching holes in walls, throwing chairs and other property destruction, hitting other students, eloping, work refusal, cursing, yelling, and crying (Compl. 24-26). C.D.'s services included intensive Individual counseling, group counseling, year-round school, individual speech

language therapy, group speech language therapy, occupational therapy, and one-on-one academic and behavioral support 24 hours a day. C.D. made progress due to LKS's program and educational environment. This intensive level of services is not available in a public or private day school setting and is an integral part of LKS's program. (Tr. 198:9-202:6, 272:9-276:15; Compl. 9, 30, 105).

22.  FCPS independently determined that placement at LKS was medically necessary. Based upon this determination, in a letter dated February 16, 2018, FCPS stated that they would partially reimburse LKS for the educational portion of C.D.'s placement and changed C.D.'s IEP placement to reflect homebound instruction. (FCPS 45). However, the actual rates for LKS during the 2017-2018 and 2018-2019 school years were much higher than what FCPS paid, and the amounts FCPS agreed to pay changed without notice or rationale. The Parent had to pay the difference in order for C.D. to access an education. (Compl. 9, 45-48).

| SERVICE | LKS | FCPS |
|---|---|---|
| Special Education | $107, 491.00 from August 2017 through June 2018 | 34.75 hours of homebound instruction at $39.21 per hour |
| Counseling/Therapy | 1.75 hours a week at $152 per hour<br>- Individual: 0.75 hours<br>- Group: 1 hour | 1.5 hours a week at $44.07 per hour<br>- Individual: 0.75 hours<br>- Group: 0.75 hours |
| Speech Language | 3 hours per week<br>- Individual speech language: 1.5 hours a week at $92.43<br>- Group and Integrated speech therapy: 1.5 hours a week at $51.35 an hour | 2.25 hours per weeks at $25.16 per hour |
| Occupation Therapy | 3 hours per week<br>- Individual OT for 1.5. hours per week at $92.43<br>- Group and Integrated OT for 1.5 hours a week at $51.35 | 1.5 hours per weeks at $32.88 per hour |

23.  The Parent disagreed with FCPS's determination that C.D.'s placement at LKS was solely for medical reasons, as the placement was due to his inability to access an education in a

lesser restrictive environment. Clinical Director of LKS, Dr. Marty Thomson, stated in a letter to the Parent dated March 12, 2018:

> [C.D.] continues to require intensive uninterrupted residential support for his emotional and social functioning, as well as successful completion of Activities of Daily Living…The gains [C.D.] has attained have been sustained only through uninterrupted support from well trained professionals with whom [C.D.] has developed a working relationship over long periods of time…At this point he still requires this level of restrictiveness and support in order to function safely and show gains.

(Tr. 272:9-276:15; Compl. 6).

24.  The Parent toured Quander Road School for the second time on November 2, 2017 and met with then-principal of the Quander Road School, Joe Thompson. (FCPS 54-002). During this meeting, the Parent stated that for 98 days during the 2016-2017 school year, C.D. was out of the classroom for 1 or more hours and required 243 support counselor visits for emotional dysregulation. (Tr. 472:12-474:19; Compl. 105, FCPS 54-002). Principal Thompson told the Parent that if a student is out of the classroom for more than an hour needing support counsel, they would call the Parent to pick the student up. The Parent expressed concern as C.D. was unable to remain in the classroom and required a high degree of support due to the manifestation of his disabilities. (Tr. 474:3-474:19, 485:4-490:1).

25.  IEP Addendum meetings were held on November 9, 2017 and January 23, 2018. The Parent expressed their concern with the accuracy of the Present Levels of Educational and Academic Performance ("PLOP") and the Prior Written Notices for these IEP meetings. (Compl. 7). In response Ms. Lateefah Walker, Special Education Department Chair for Mount Vernon High School, sent an undated letter summarizing the discussions during the IEP meetings. (FCPS 41). However, Ms. Walker's letter contained multiple inaccuracies which the Parent corrected in their March 15, 2018 Letter. (Compl. 7). The inaccuracies included the timeline regarding Parent' requests for assessments, to include significant delays in conducting FBA and Assistive Technology Assessments, and FCPS's delayed responses, issues with FCPS observations and inaccurate

reports of discussions with LKS staff. The letter also reiterated the Parent' continued disagree-

ment with FCPS's proposed IEP placement at the Quander Road School and lack of a BIP in the

IEP. (Tr. 335:5-338:9, Compl. 7).

26.  Additional IEP meetings were held on March 20, 2018 and April 27, 2018. The

March 20, 2018 IEP stated, "LKS staff is requesting what next steps are so as to support his tran-

sition were he to return to FCPS." (FCPS 50-021). However, LKS staff had not stated this nor

had they recommended C.D. attend a less restrictive environment but had continued to recom-

mend placement at LKS. (Tr. 340: 9-342:3). In fact, LKS had participated for a portion of the

meeting and had shared their concerns regarding C.D.'s recent behaviors: "LKS data indicates

occasions where [C.D.] is out of class and supported by a counselor because he exhibited 'ex-

treme behaviors' which included noncompliance, disrespectful responses to staff and use of pro-

fanity. Recently he was aggressive towards staff, used profanity with staff and eloped from the

campus. During that incident, LKS staff used restraint." (FCPS 50-020). A BIP was developed

during the March 20, 2018 IEP meeting. However, it had consisted of a goal that was not rele-

vant to C.D.'s areas of need due to his interfering behaviors. (Tr. 338:18-339:22). Subsequent

IEPs did not contain a BIP. (Tr. 338:18-339:22, 344:21-346:4; FCPS 52, 62, 125). After the

meeting, Maria Newman from FCPS Multi-Agency Services who had conducted an observation

and told the Parent that this would be her last meeting and that C.D. was "in the right place" re-

garding his placement at LKS. (Tr. 563:8-563:20). C.D.'s post-secondary transition plan and Ex-

tended School Year services were discussed during the April 27, 2018 IEP meeting. FCPS con-

tinued to propose placement at the Quander Road School despite the data shared by LKS and

Parent concerns. (FCPS. 52-019 to 52-020).

27.  An annual IEP meeting was held on October 29, 2018. (FCPS 62-029). The IEP

identified C.D. as a 12th grade student. However, due to C.D.'s emotional dysregulation and

other manifestations of his autism and emotional disorders LKS determined that courses that

were more challenging for C.D. would be worked on at a much slower pace or completed over two school years, such as Geometry and Economics and Personal Finance. (Tr. 493:5-493:22). C.D.'s behaviors had been exacerbated due to the demands of his online Apex Economics and Personal Finance class and had to withdraw from the class as he was unable to keep up with the coursework, even with one-on-one support and a modification of his schedule from one to two class periods. (Tr. 346:5-349:5). Writing tasks and English coursework had been especially challenging and LKS recommended a Writing course during the 2018-2019 school year instead of English 12 to address writing and grammar skill deficits and prepare him to take English 12 the following school year.  (Tr. 496:16-499:4, FCPS 62-030). The IEP was not completed and the team reconvened on January 8, 2019 and February 26, 2019.

28.  The Parent was granted Guardianship of an Incapacitated Adult over C.D. by court order on November 30, 2018. In support for the Guardianship petition, Dr. Byrnes stated "He experiences significant cognitive interference when he is feeling emotions that are overwhelming. Unfortunately, this leads him to act out in ways that are extremely maladaptive (refusal, avoidance, aggression.)." He further stated "His ability to learn self-care skills, adaptive behavior and social skills are compromised significantly. He requires an immersive environment with 24-hours supports and skilled staff who can teach him and reinforce these skills perpetually." (Compl. 27).

29.  During the January 8, 2019 meeting LKS addressed FCPS's concerns that C.D. would not be able to graduate at the end of the 2018-2019 school year as he was not enrolled in English 12 and a math course.[1] During the February 26, 2019 IEP meeting, they shared that "[C.D] continues to require emotional support to self-regulate. He has made progress in tolerating his emotions but does require time to process his feelings after the fact. . . He required one-

---

[1] It should be noted that C.D. also needed a history course and Economics and Personal Finance to graduate, not only the English 12 and math courses.

on-one academic support to complete an online APEX course (Writing Skills & Strategies) due to the following behaviors: refusal, feeling overwhelmed and/or elopement from the workspace. LKS staff believe the online platform was challenging for [C.D.] to keep up with the pace of instruction, despite receiving an extension of the course." (Compl. 84-002; FCPS 62-028). Despite the data shared by LKS and the Parent, FCPS maintained that they would not pay for classes that do not satisfy graduation requirements for a standard diploma and that based upon their own limited observations and review of the data that the LKS environment was harmful due to "the lack of exposure to natural environments and typically developing peers." (FCPS 62-027). The Parent strongly disagreed stating that the environment at LKS and one-on-one supports is what have allowed C.D. to have been successful. (FCPS 62-026). C.D. had progressed in the LKS Level System from a Level 2 during the 2017-2018 school year to a Level 3 during the 2018-2019 school year, which was a sign that C.D. had made progress in the LKS program. (Tr. 510:6-512:9). The Parent were shocked that FCPS refused to pay for C.D.'s courses as well as his support services as C.D. had not met his IEP goals and still needed specialized instruction and related services to address academic, speech-language (to include social skills and articulation), executive functioning, social-emotional functioning, self-care, adaptive skills and behavioral deficits. (Tr. 506:18-508:16; Compl. 84-002, 84-007; FCPS 62-025 to 62-032).

30.  Dr. David A. Byrnes, C.D.'s psychiatrist continued to strongly recommend residential placement and stated in a letter dated January 30, 2019, "[C.D.] has been diagnosed with an Autism Spectrum Disorder, ADHD combine type, and Major Depression. These psychiatric symptoms have been significant and long lasting resulting in necessary placement into a residential therapeutic boarding school... Each of his diagnoses complicates and worsens the severity of the others. His developmental delay and autistic features also come with executive functioning,

and sensory processing difficulties that worsen his concentration and simultaneously create a more anxious/depressed experience of living." (Compl. 14).

31. FCPS requested updated evaluations during the 2018-2019 IEP meetings. (FCPS 79-028). The Parent consulted with LKS staff and Dr. Byrnes prior to consenting due to C.D.'s continued emotional dysregulation and penchant to be overwhelmed during the 2018-2019 school year. (Compl. 84). They suggested waiting until after C.D.'s school year was finished and he could focus on preparing to transition. (Compl. 84-022 to 84-024). The Parent consented to the evaluations being conducted after the school year had ended. (FCPS 71).

32. A Transition IEP meeting was held on March 19, 2019, and an IEP Addendum was developed that included Extended School Year ("ESY") services from July 8-26, 2019, with additional ESY services to be given June 27-28, 2019, July 1-3, 2019, and August 5-9, 2019. (Tr. 524:12-525:1; Compl. 43; FCPS 65). The Parent was told that approximately 20 students would be participating during the July 8-26, 2019 session, and approximately five students would be participating in the extra sessions. However, when C.D. arrived at Quander Road School on July 2, 2019, there was no educational programming available and he was turned away. The Parent was then instructed to re-enroll and register in FCPS, despite the fact that C.D. had an active IEP providing services through a homebound placement designation and was therefore an enrolled FCPS student. (Tr. 524:12-526:20).

**C. C.D.'s Educational Placement for the 2019-2020 School Year.**

33. C.D. was able to attend ESY during the normal session, July 8-26, 2019. The Parent requested that FCPS conduct the updated testing discussed during the February 2019 IEP meeting during ESY, July 2019. FCPS agreed and conducted psychological, educational, speech language, and occupational therapy evaluations. C.D. spent a large amount of his time during ESY working in a garden and volunteer opportunities instead of working on his IEP goals. When Quander Road School administration told C.D. he would be the only student participating in the

August 5-9, 2019 session, and that they were having difficulty finding staff to teach him, he became very upset and perseverated on the situation. (Tr. 528:22-529:6; Compl. 104B at 40:50). The social skills programming focused on during the August 2019 session involved a review of social scenarios, which C.D. has done for many years and did not address his inability to generalize skills, nor give him an opportunity to do so, as he was the only student. (Compl. 104A at 1:32, 104C 31:21). The Parent expressed concern that the ESY programming was not appropriate to address his needs. (104A at 10:20, 24:18; 104B at 41:10, 46:10, 47:40; FCPS 79-026).

34.  On July 10, 2019, The Parent provided FCPS with "Summary of Need for 1:1 Support in Writing Skills and Strategies Course" written by the Director of Academic Services at LKS, Jennifer Payne. In the summary, Ms. Payne states "During his enrollment at [LKS], [C.D.] required 1:1 staff support for non-preferred classes and assignments, classes that were rigorous in content or pacing, and when he was emotionally overwhelmed. It is our recommendation that [C.D.] continue to receive this level of support in future classes that are rigorous in nature, non-preferred subject areas and when he is emotionally overwhelmed." (Compl. 30).

35.  During the August 15, 2019 IEP meeting, the IEP team reviewed the updated testing conducted by FPCS. (Compl. 104A; FCPS 79). The Parent reiterated their request for FCPS to consider a more restrictive placement and shared that C.D. had begun to exhibit noncompliance with nonpreferred tasks and greater levels of emotional dysregulation to include verbal outbursts, stomping behaviors, cursing, and yelling. The Parent observed that the FCPS evaluations were inconsistent with the data from LKS. They requested FCPS consider C.D.'s need for one-on-one support, but FCPS disagreed. (FCPS 79-025 to 79-027).

36.  Dr. Jay R. Lucker conducted Speech Language Independent Educational Evaluation ("IEE") on September 6, 2019. He found significant speech articulation distortions impacting the understanding of C.D.'s speech and recommended an oral-motor speech production evaluation

and PROMPT therapy program. (Tr. 360:10-361:7; Compl. 32). Dr. Lucker also identified language issues and found a 30 point standard score difference between expressive and receptive vocabulary, indicating a potential underlying auditory processing disorder and recommended a comprehensive auditory information processing assessment. (Tr. 361:8-361:19; Compl 32). He also found that C.D. had poor understanding and use of grammatically appropriate word and sentence structure and recommended language therapy. (Tr. 361:20-362:5; Compl. 32). Due to C.D.'s poor social and pragmatic communication and understanding, Dr. Lucker recommended he continue to work on these areas of weakness with a SLP. (Compl. 32).

37. A Back-To-School Night event was held at Quander Road School on September 18, 2019. During the session with C.D.'s math teacher, it was explained that the course was modulated to the pace of the students and that the entirety of the curriculum may not be taught. (Compl. 50). The Economics and Personal Finance teacher emphasized that he focused on the students passing the WISE exam but had no knowledge of what was generally taught at the high school or online level. (Id.). All of the teachers indicated that homework would not be assigned as a policy. (Id.).

38. A combined re-evaluation and eligibility meeting was held on October 24, 2019. C.D. was found to continue to be eligible under Autism, Emotional Disability, Other Health Impairment for ADHD and Sensory Processing, Specific Learning Disability for Writing, and also Speech Language Impairment. Dr. Jay R. Lucker's IEE recommendations for an Auditory Processing Assessment and Comprehensive Oral-Motor Speech Language evaluation were discussed. FCPS agreed to conduct these evaluations. (Compl. 32; FCPS 112-025).

39. Dr. William D. Ling conducted a psychoeducational IEE over three sessions: October 22, 28 and November 4, 2019. (Tr. 675:11-14; Compl. 33). Dr. Ling's testing included records review, testing on areas of cognitive functioning, academic achievement, verbal and nonver-

bal information processing, attention, executive functioning, adaptive behavior functioning, psychological functioning, and presence on the Autism Spectrum, and classroom observation at the Quander Road School. (Tr. 677:7-17; Compl. 33). Dr. Ling found that C.D. continues to demonstrate unstable functioning capacity associated with autism spectrum disorder despite the years of intervention. He stated that C.D.'s overall neurocognitive functioning in areas such as cognition and academic achievement was to be expected for his age, but that there was a marked contrast with other significant areas of functioning. (Tr. 677:21-678:7). These areas of deficit or fragility include C.D.'s working memory span, academic achievement in the area of writing and written expression, attention, executive functioning, stamina, and behavioral control. (Tr. 678:8-680:18). He also noted C.D.'s inability to initially internalize interventions while demonstrating the capacity to subscribe to behavioral interventions over time. (Compl. 33). Dr. Ling recommended that C.D. remain in secondary school until the age of 21 with a structured behavioral program similar to LKS to facilitate improvement in functional behavior skills, to include one-on-one support. (Tr. 696:10-702:16; Compl. 33-022).

40.  An IEP Meeting was held on October 31, 2019, to discuss the Parent's request for oral motor speech assessment and an auditory processing assessment completed by an audiologist per Dr. Ling and Dr. Lucker's recommendations. (Compl. 104B at 42:15, 45:00, 1:13:00; FCPS 112-024). The IEP team conceded that C.D. had regressed in the area of articulation but did not change the IEP goal or short term objectives other than to change the measurement criteria from quarterly to monthly. The Parent requested that the IEP related services hours from LKS be maintained at Quander Road School. FCPS refused to increase the proposed IEP services hours. (Compl. 104B at 36:10, 40:55, 42:55, 47:35; FCPS 112-024 to 112-025).

41.  An IEP Team meeting was held on December 12, 2019. (Compl. 104C; FCPS 115). The Parent asked questions regarding data related to the reported IEP goal progress and was told that the space to record the progress was limited. (Compl. 104C at 00:13:00-00:16:00). There

was also a discussion regarding the implementation of the IEP goals in the area of Executive-Functioning. Due to the programming at Quander Road School (no homework, no tracking of in-complete assignments, etc.) FCPS shared that they were unable to implement these goals as they had been intended when they had been written in August 2019. (Compl. 104C 00:36:45-00:45:00). The Parent also shared concerns from parent-teacher conferences regarding the rigor of the courses and expressed concern that teachers were not holding C.D. to the standard of the coursework but instead allowing him to complete half of an assignment and calling that "good." (Compl. 104C at 00:48:50-00:50:15).

42.   During the January 30, 2020 IEP meeting, FCPS stated they were unable to deter-mine whether C.D. had deficits in auditory processing, as C.D. refused to participate in the audi-tory processing evaluation that FCPS conducted on January 29, 2020. (FCPS 124).The SLP was able to conduct the Oral-Motor Assessment, although the relationship between C.D. and the FCPS SLP had been deteriorating since the beginning of the 2019-2020 school year. The Parent requested an IEE for the Auditory Processing evaluation on February 7, 2020. They informed FCPS that they intended to seek reimbursement for the cost of the IEE if denied. FCPS sent the Parent a denial letter dated April 24, 2020, however confused and conflated two separated parent requests for IEEs (Auditory Processing and Oral Motor). (FCPS 136).

43.   Another IEP meeting was held on February 19, 2020. (Comp. 104E). The team dis-cussed continuing issues with C.D.'s work initiation for non-preferred tasks and with communi-cating with peers. C.D.'s teachers shared that he would become distressed and emotionally over-whelmed. (FCPS 129-017). The Parent shared that she and C.D. felt he had regressed in speech articulation and stamina. The Parent mentioned that C.D. works very hard to "keep it together" during the school day and was having issues with emotional regulation in the home. (FCPS 129-017 to 129-018).

44.   Dr. Jay R. Lucker conducted the Auditory Processing Evaluation on February 28,

2020 and found that C.D. had severe deficits in Auditory Temporal Processing Auditory Working Memory, Lexical Integration and Phonological Integration and Organization which have significant impacts on education, social communication and emotional regulation. (Tr. 391:3-396:19; Compl. 34). Dr. Lucker found that as C.D.'s system became overwhelmed and frustrated, he would "shut down" and exhibit behaviors that looked like inattention. (Compl. 34). Dr. Lucker stated that C.D.'s problems in the area of Auditory Processing influence tremendously C.D.'s social communication, writing, and understanding. Combined with C.D.'s receptive language problem which also impacts C.D.'s processing issues. (Tr. 392: 1-396:19; Compl. 34). He strongly recommended necessary accommodations and direct therapies to address C.D.'s need according to his Auditory Processing Deficits in order to make progress in this severe area of deficit. (Compl. 34-006 to 34-007).

45. The Parent filed a due process complaint on March 11, 2020, stating:

Since at least March 2018, FCPS has procedurally and substantively violated the IDEA resulting in a failure to provide C.D. a FAPE. These violations include, but are not limited to; (1) Failure to offer an IEP reasonably calculated to provide a Free and Appropriate Public Education ("FAPE") to C.D. during the 2017-2018, 2018-2019, and 2019-2020 school years; (2) Failure to offer an appropriate IEP placement according to C.D.'s Least Restrictive Environment for his unique needs according to his disabilities during the 2017-2018 and 2018-2019 school years; and (3) Failure to offer and implement appropriate IEP accommodations, goals, and related services to meet C.D.'s needs according to his disabilities during the 2019-2020 school year.

46. Another IEP meeting was held on March 12, 2020. The Parent expressed their concern with the lack of life skills instruction for C.D. and regression in C.D.'s writing ability and spelling. (FCPS 129-016). The FCPS members of the IEP team stated they would develop goals to consider at the next IEP meeting. The Parent also repeated their concerns with C.D.'s lack of progress and regression in the area of Speech Language and articulation as well as the communications from the FCPS SLP and teachers of C.D.'s work refusal and disrespectful behavior. Despite these statements, the IEP PLOP did not reflect this and instead stated that C.D.

had made progress without data to support this assertion.[2] (FCPS 129-016 to 129-017).

47.  An Oral-Motor Assessment was done on March 16, 2020, by Michael Lemieux, MS, CCC-SLP. The Report was completed on April 12, 2020 and provided by the Parent to FCPS. Mr. Lemieux diagnosed C.D. with Phonological Disorder, Feeding Difficulties, Dysphagia-Oral Phase, Ankloglossia – Posterior Tongue Tie, Other Dentofacial Anomalies – Malocclusion due to MYO, Other Dentofacial Anomalies – Forward Swallow Pattern, and High Dental Arch due to MYO. The evaluator recommended Myofunctional Therapy and Feeding Therapy due to C.D.'s deficits in oral-motor and feeding skills. He found that C.D. would significantly benefit and made recommendations to include goals to improve his skills to include tongue lateralization, tongue protrusion, production of /r/ and /er/, among other goal areas. (Compl. 35).

48.  On May 1, 2020, C.D.'s SPED Case Manager called the Parent to discuss the Temporary Learning Plan ("TLP") which outlined the significant reduction in IEP services for the remainder of the 2019-2020 school year. The Parent received a written TLP dated May 3, 2020 by email. The Parent disagreed with the TLP and refused to sign it in agreement. (FCPS 137).

49.  IEP meetings were held on May 19, 2020 and May 26, 2020, to review the Auditory Processing and Oral-Motor IEEs and discuss C.D.'s IEP for the 2020-2021 school year, specifically in the STEP program offered at Mount Vernon High School. (Compl. 104G, 104H, 106, 107). The Parent repeated their requests for IEP goals to address C.D.'s deficits in the areas of Auditory Processing, Speech Language, Reading, Writing, Budgeting, Self-Presentation, and Life Skills. FCPS members of the IEP team denied the need for any auditory processing or academic goals. The Parent also raised concerns with the level of academic rigor and pacing, and that the curriculum at Quander Road during the 2019-2020 school year did not meet the Virginia

---

[2] It should be noted that the Parent had routinely requested data from Quander Road School to support the assertion "C.D. is making progress." The very limited amount of data produced supported that C.D. was missing assignments and that his teachers were not penalizing him or grading him on the basis of performance, as his work indicated regression in the area of writing, among other areas, and that C.D. stamina and work product had markedly declined since attending Quander Road School.

Standards of Learning. The IEP team refused to add any additional academic or life skills goals, although a self-presentation goal was added. The Parent expressed that C.D.'s needs were not adequately addressed in the IEP and that private placement may be appropriate.

50.  On June 1, 2020, the due process complaint was amended to include the Parent's concerns regarding the proposed May 26, 2020 IEP and the TLP IEP. In addition to the claims raised in the March 11, 2020 complaint, the Parent added: (1) The May 26, 2020 IEP proposed by FCPS fails to offer a FAPE for the 2020-2021 school year, and (2) The TLP FCPS implemented despite the Parent's clear disagreement during the 2019-2020 school year fails to meet C.D.'s needs according to his disabilities.

51.  On or about July 18. 2020, The Parent provided FCPS with formal notice in adherence to the IDEA that they disagreed with the May 26, 2020 IEP and that they intended to enroll C.D. at the Devereux Glenholme School ("Glenholme") for the 2020-2021 school year and intended to seek tuition reimbursement for the placement. Glenholme is a co-educational special needs boarding school for students on the autism spectrum and other disabilities located in Washington, CT. Glenholme stated in their acceptance letter dated August 10, 2020, "It is the clinical team's opinion that [C.D.] would benefit from the positive-based, 24-hour-structured therapeutic environment and the special education program that can be individualized to meet his needs."  C.D. began attending Glenholme on August 26, 2020.

52.  In September 2020, Glenholme conducted baseline assessments to include academic and functional areas. C.D. was diagnosed with Disruptive Mood Dysregulation Disorder (DMDD) by Dr. Lisa B. Namerow, a board certified child and adolescent psychiatrist and consultant at Glenholme.

53.  On November 16, 2020, Lilian Burstiner, C.D.'s teacher at Glenholme emailed the parent to let them know that despite the supports put in place to help C.D. access the Economics and Personal Finance class, he was not able to do so. Ms. Burstiner noted that C.D. needs direct

coaching and face-to-face instruction, which they would develop a plan to provide during the 3rd and 4th quarters of the school year.

## V. <u>Statutory Authority</u>

54. The purpose of the IDEA is to ensure that "all children with disabilities have available to them a Free and Appropriate Public Education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). IDEA and the regulations thereunder, 34 C.F.R. § 300.100 *et seq.*, and 8 V.A.C. 20-81-10 *et seq.*, require that Local Educational Agencies ("LEAs") like FCPS must provide disabled children with a Free and Appropriate Public Education ("FAPE"), as well as provide extensive due process procedures to effectuate that right.

55. The appropriateness of a special education student's education must be decided on a case-by-case basis, in light of the unique needs of each eligible student. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 553 IDELR 656 (U.S. 1982)*. According to the two-part Rowley test, the state must (1) comply with the procedures set forth in the IDEA, as well as (2) develop an IEP that is reasonably calculated to enable the child to receive educational benefits. *Id.* In addition, the Supreme Court of the United States of America held in *Endrew v. Douglas Cty. Sch. Dist. RE-1*, that in order to meet the second prong of the two-part Rowley test regarding a school district's substantive obligation under the IDEA, " . . . a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew v. Douglas Cty. Sch. Dist. RE-1, 2017 WL 1066260 (2017)*. The Court also stated that " . . . the essential function of an IEP is to set out a plan for pursuing academic and functional advancement." *Id.*

56. The IDEA and its regulations establish a comprehensive format by which a school district must identify and evaluate all children with disabilities who may require special education and related services. This is known as the "Child Find" obligation, and also includes a school

district's responsibility to assess the child in all areas of suspected disability. 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(c)(1). The LEA is then responsible to identify the child's area(s) of needs, determine the IDEA eligibility category, and develop and implement an appropriate IEP that contains appropriate "educational instruction specially designed to meet the unique needs of the handicapped child, . . . supported by such services as are necessary to permit the child to benefit from the instruction." *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176 at 188-89 (1982). The IEP is developed by an IEP Team consisting of LEA officials and the child's Parent who may have knowledge or special expertise regarding the child. *Sch. Bd. of the City of Norfolk v. Brown*, 769 F. Supp. 2d 928, 941-920 (E.D. Va. 2010); §1414(d)(1)(B).

57. 34 C.F.R. 300.320 (a)(2) states that an IEP must include "A statement of measurable annual goals, including academic and functional goals designed to: a. Meet the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum" and "b. Meet each of the child's other educational needs that result from the child's disability."   In addition, courts have held that the IEP should be portable, or pass the "stranger test", meaning that an appropriately written IEP could be implemented and progress measured by someone unfamiliar with the student. *Mason Cty. Comm. Sch. Dist. 46 IDELR 148 (SEA IA 2006).*

58.  In *Kirby v. Cabell Cnty. Bd. of Ed.*, a 2006 case heard in the Southern District Court of W.Va., the court held that the Present Level of Performance section on a student's IEP was deficient when the student's grades suggested that he was performing at a higher level than other evaluations and data suggested.[3]   The court held that, "If the IEP fails to assess the 'child's present levels of academic achievement and functional performance,' the IEP does not comply with § 1414 . . . This fundamental discrepancy, between his level of achievement as measured by objective

---

[3] *See also Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 553 IDELR 656 (1982) (holding that advancing from grade to grade in a regular school system does not mean that the handicapped student is automatically receiving FAPE); 34 C.F.R. 300.101(c)(1).

testing and his advance through grades has not been addressed in the IEPs." *Kirby v. Cabell Cnty. Bd. of Ed.*, *46 IDELR 156, 164 (D.C. W.Va. 2006)*.

59.   In *Rowley,* the Supreme Court of the United States also outlined the importance of parental participation in the IEP process. They stated, "Congress sought to protect individual children by providing for parental involvement in… the formulation of the child's individual educational program." *Rowley*, 458 U.S. at 208.   In fact, in the IDEA, Parents appear first on the list of required IEP team members.   34 C.F.R. 300.321(a)(1) (2007).   In *Honig v. Doe*, the Supreme Court noted that the law provides for "meaningful parental participation" in all aspects of the child's educational placement.   484 U.S. 305, 324 (1988).   Accordingly, the Fourth Circuit has emphasized that "special education laws require that extensive efforts be made to involve Parent in IEP meetings and decisions."   *DeVries by DeBlaay v. Spillane*, 853 F.2d 264, n.1 (4th Cir. 1988).

60.   Parental participation also requires school districts to have parental consent before changing any part of a student's IEP. Included in this is the fact that Parent's may choose to provide consent to only certain parts of a child's IEP. 8 VAC 20-81-170(E)(4)(d) (34 C.F.R. § 300.300(d)(3)) provides that a school division "may not use a parent's refusal to consent to one service or activity to deny the parent(s) or child any other service, benefit, or activity of the local educational agency . . .".   As well, the Virginia Department of Education ("VDOE") has stated that Virginia Regulations clearly mandate school divisions ensure that an IEP is implemented as soon as possible following parental consent to the IEP.   (8 VAC 20-81-110(B)(2)).   While this regulation does not explicitly state that the school district must accept a Parent' partial agreement, when read in light of 34 C.F.R. § 300.300(d)(2) and (3) and 8 V.A.C. 20-81-170(E)(1)(d), it is clear that a school district should not construe a Parent' partial denial of an IEP as permission to refuse to accept a partial agreement and deny the remainder of the IEP.

61.   Under the IDEA, the school district must provide a residential placement at no cost to the Parent if it is necessary to provide the student with SPED and related services. *34 C.F.R. 300.104*. In cases where a student's educational and social, mental and/or emotional health needs cannot be separated and the student will not be able to receive an academic benefit without a therapeutic residential placement, this level of placement is considered intrinsic to the student's education and the school district is responsible to fund the placement. *Kruelle v. New Castle County Sch. Dist.*, 552 IDELR 350 (3d Cir. 1981)

62.   In instances in which a parent disagrees with the results of any testing conducted by the school divisions, they may request an IEE at public expense pursuant to *34 C.F.R 300.502*. *34 C.F.R 300.502(b)(1)* states, "A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency. *C.F.R 300.502(b)(2)* continues, "If a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either: (i) File a due process complaint to request a hearing to show that its evaluation is appropriate; or (ii) Ensure that an independent educational evaluation is provided at public expense."

63.   In some cases, a school district may request additional information from the parent regarding the IEE. According to 34 C.F.R. 300. 502(b)(4), "If the parent(s) requests an independent educational evaluation, the local educational agency may ask for the reason for the parent's objection to the public evaluation.  However, the explanation by the parent(s) may not be required and the local educational agency may not unreasonably delay either providing the independent educational evaluation at public expense or initiating a due process hearing to defend the public evaluation."

64.   In the case of a dispute over the appropriateness of a student's IEP, the most recent effective IEP becomes the "stay-put" IEP and must continue to be implemented during the dispute period.  The rights bestowed upon students and families by the IDEA are enforceable through

multi-level administrative and judicial procedures. 20 U.S.C. § 1415; 34 C.F.R. §§ 300.507; 300.511- 300.516; 8 V.A.C. 20-81-210 *et seq*.

65. When a school district fails to provide FAPE under the IDEA, it is well-settled that compensatory education is an available remedy for the student. Compensatory Education involves "discretionary, prospective, injunctive relief-crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student." *G. v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 308-09 (4th Cir. 2003).

66. In *Sch. Comm. of Burlington v. Dept. of Ed. of Massachusetts*, the Supreme Court of the United States determined that it was possible for the LEA to be responsible for the reimbursement of costs associated with unilateral private parental placement of a student with disabilities in cases where: (1) The school's IEP is found to be inappropriate, and; (2) The private program is found to be appropriate under the IDEA.  *Sch. Comm. of Burlington v. Dept. of Ed. of Massachusetts, 471 U.S. 359 (1985)*.

67. A district court reviewing an administrative decision under the IDEA must conduct an independent, *de novo* review. *E.L. ex rel. Lorsson v. Chapel Hill–Carrboro Bd. of Educ.*, 773 F.3d 509, 516–17 (4th Cir.2014). The district court must also give due weight to the administrative proceedings. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty.  v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Under this standard, when the hearing officer's findings of fact are regularly made, they are entitled to prima facie correctness. *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir.1991). The Fourth Circuit held in *Henrico County v. Z.P.*, that factual findings made during the state administrative proceeding are entitled to a presumption of correctness, so long as the findings were "regularly made." *Henrico County v. Z.P.*, 399 F.3d 298, 304-05 (4th Cir.2005).

## VI.   Issues

68.   Pursuant to the above standards, the Hearing Officer's decision in the present case cannot be described as "regularly made" as the Hearing Officer failed to: (1) consider all of the evidence and testimony presented during the due process hearing, (2) incorrectly identified the issues in the case, (3) incorrectly found that the Parent are estopped from arguing the LEA did not offer FAPE for the 2018-2019 school year, refusing to consider whether LKS was C.D.'s appropriate placement under the IDEA, (4) incorrectly found that the LEA offered FAPE for the 2019-2020 school year, and (5) failed to address the issues raised regarding the inappropriateness of the proposed placement in the STEP program for the 2020-2021 school year in the virtual or non-virtual settings.

**A. The Hearing Officer Failed To Consider All Of The Evidence And Testimony Presented During The Due Process Hearing And Made Numerous Factual Errors On Which He Based His Decisions.**

69.   In failing to consider all of the evidence presented, the Hearing Officer made numerous factual errors in his decision, to include the following:

a.) The Hearing Officer misidentified the issues in the case. There were at least five pre-hearing teleconferences, but the Hearing Officer only provided two pre-hearing reports dated March 23, 2020, and April 7, 2020. The First Pre-Hearing Report states that the issues are as follows:

> 1. Did the LEA fail to propose an appropriate IEP during the 2017-2018 and 2018-2019 school year.
> 2. Should the Parent' unilateral placement at Little Keswick School tuition costs be reimbursed.
> 3. Is the Student's failure to make adequate progress and regression in areas of need due to the lack of adequate transition services, goals, accommodations, services, and placement for the 2019-2020 school year.
> 4. The LEA has indicated it may raise a statute of limitations issue.

With regard to the statute of limitations issue, the school district's motion to dismiss was denied during a teleconference on April 24, 2020, during which the issue of statute of limitations was

addressed. However, the Hearing Officer failed to provide written documentation of his decision

on the school district's motion. With regard to the issues in the case, the Hearing Officer

unilaterally changed them to match the school district's language in their filings, listing the issues

as follows:

> 1. Are the Parent estopped from arguing the LEA did not offer FAPE for the 2018-2019 school year?
> 2. Did the LEA fail to offer FAPE for the 2019-20 school year?
> 3. Does the LEA proposed STEP program offer FAPE and, if not, does the Glenholme School offer FAPE for the 2020-21 school year?

The claims raised in C.D.'s Complaints are as follows:[4]

> 1. FCPS failed to propose an appropriate IEP for C.D. during the 2017-2018 and 2018-2019 school years that was reasonably designed to meet C.D.'s needs according to his disabilities.
> 2. Due to the appropriateness of Little Keswick School and the School District's failure to provide a FAPE, the cost of the Parent' unilateral parental placement at Little Keswick School should be reimbursed.
> 3. C.D. has not made adequate progress and has regressed in areas of need according to his disabilities due to the lack of adequate transition services, goals, accommodations, services, placement in his IEP for the 2019-2020 school year and the IEP proposed for the 2020-2021 school year fails to adequately address this issue as well as fails to offer a FAPE.

Due to his misidentification of the Parent's claims, among other issues, the Hearing Officer failed

to make a determination on all of the actual claims raised by the Parent in his decision.

b.)  The Hearing Officer erroneously stated that the parties stipulated that C.D.'s placement

at LKS was for both medical and educational purposes. (Hearing Officer Decision, p. 3). There

was no such stipulation made in writing or even orally stated by the parties. In fact, this was the

Parent's argument, made with the support of numerous experts, as the evidence and testimony

clearly indicated during the due process hearing, but not the school district's argument. (Tr. 191:1-

191:22; Compl. 103; Tr. 207:15-217:3; Compl. 116; FCPS 8). FCPS never offered, nor did the

Parent sign an agreement stating that FCPS would place C.D. at LKS at the homebound rate if the

---

[4] It should be noted that the only change between the original March 11, 2020 Due Process Complaint and the June 1, 2020 Amended Complaint is regarding the disagreement to FCPS's proposed May 26, 2020 IEP.

Parent would waive C.D.'s right to a FAPE. The Parent clearly stated at every opportunity that C.D.'s needs according to his disabilities required placement in the residential setting available at LKS and that his placement was for both educational and medical reasons and requested that FCPS place him through the IEP. (Tr. 164:10-165:16; Compl. 115; Tr. 335:5-338:9, Compl. 7)

c.) The Hearing Officer mistakenly stated that the Parent failed to submit a Physician's Certification and that FCPS's acceptance signified that they were "more interested in obtaining documented proof the Parent understood the limits of the compromise they had reached. That is, the LEA would pay only the proposed amount and justify it as the LEA's contribution to educational costs" (Hearing Officer Decision p. 3). However, Dr. Byrne is a psychiatrist, which according to the American Psychiatric Association, is a medical doctor who specializes in mental health, and is therefore a physician. (https://www.psychiatry.org/patients-families). Also, neither FCPS nor the Parent claimed that such an arrangement existed, namely that FCPS would only pay the proposed amount and would look the other way regarding the certification.

d.) The Hearing Officer continued to elaborate on the error, stating that "Proof that the Parent agreed to this compromise can be found in Parent Ex. 8 wherein the mother wrote: "We continue to believe that [the Student] requires placement in a therapeutic, residential program for both medical and educational purposes and appreciate your continued support." (Hearing Officer Decision, p. 4). As testified to by both parties, no such compromise had ever been proposed nor accepted. Had both parties agreed that the placement was for both medical and educational reasons, it would have been documented in the IEP. However, FCPS has refused to acknowledge that the LKS placement was for educational reasons, while the Parent consistently held that it was. Throughout the 2017-2018, and 2018-2019 school years, they requested placement at LKS through the IEP, further evidence that the Hearing Officer failed to review and consider all evidence. (Tr. 164:10-165:16; Compl. 115; Tr. 335:5-338:9, Compl. 7; Tr. 191:1-191:22; Compl. 103; Tr. 207:15-217:3; Compl. 116; FCPS 8). His statements also indicate a fundamental misunderstanding

of the issues raised in the due process case.

e.) The Hearing Officer inexplicably then states "Had this issue been brought before a Hearing Officer, the hearing officer might have decided the LEA did offer FAPE and, therefore, the Parent were not entitled to reimbursement for the unilateral placement at LKS. In the alternative, the Hearing Officer might have decided that the Student's propensity for extreme behavior mandated his placement at LKS at public expense." (Hearing Officer Decision, p. 4). This was one of the issues raised in the original due process complaint and in the amended due process complaint. (Amended Compl. 13, 15, 16, 17, 34, 38, 41, 43, 45; Compl. 15, 19, 31, 34, 38, 40, 42). The Hearing Officer seems unaware that this was one of the central issues in the case, which is a concern, as he seems to believe that the Parent raised the issue for the first time in the closing brief. (Hearing Officer Decision at 4). He even states "In their closing briefs, the Parent now argue that the Student was placed at LKS solely for educational purposes and that LKS is solely an educational institution. That may be true. But if it is true, the Parent and the LEA engaged in the fiction that LKS also provided medical services so as to avoid having the issue decided by a hearing officer." There was no such arrangement, the Parent's complaints clearly outline the issues, the evidence and testimony of LKS staff and the Parent clearly addressed this issue, and the Parent continually advocated for C.D.'s placement to be recognized through the IEP process, pursuant to the IDEA.

f.) The estoppel argument that the Hearing Officer found persuasive is based upon an erroneous understanding of the procedural safeguards outlined in the IDEA and a failure to review the facts of the case. The one-year statute of limitations referenced in the case cited by the Hearing Officer is not applicable to the present case. *Ian H. v. Fairfax County Sch. Bd.*, No. 97-168-A, slip. op at 1-2, (E.D. Va. Sept. 5, 1997). The Parent filed their due process complaint within the two-year statute of limitations described in the IDEA. 20 U.S.C, §1415(b)(6); 34. C.F.R. §300.507(a); 8 V.A.C. 20-81-210(E). The Parent raised claims based upon their disagreement with the IEP

proposed by FCPS on March 20, 2018, and filed their due process complaint within the two-year statute of limitation on March 11, 2020. (Compl. 1, p. 3; FCPS 50). Throughout the process, the Parent tried to collaborate with FCPS, and shared their significant concerns with the IEP. (Compl. 104A at 10:20, 24:18; 104B at 41:10, 46:10, 47:40; FCPS 79-026). They gathered and presented updated information from numerous special education, speech language, psychological, psychiatric, and other experts to inform the IEP team decisions. Unfortunately, FCPS presented numerous barriers to the development of an appropriate IEP with myriad of meetings and evaluations and observations which delayed the IEP process. (Closing Br. 15). The Hearing Officer's decision amounts to punishing the Parent for trying to work collaboratively with the IEP team and ignores the statute of limitations outlined in the IDEA.

g.) The. Hearing Officer erroneously stated that the Parent were not seeking any compensatory relief for the 2019-2020 school year. (Hearing Officer Decision, p. 4). The Parent raised claims that C.D. was denied a FAPE during the 2019-2020 school year, for which the remedy under the law is Compensatory Educational Services. They further requested the Hearing Officer consider placement at the Glenholme School as a Compensatory Education for the denial of FAPE during the 2019-2020 school year. (Compl. 1, pp. 21-26). The Hearing Officer further states that based upon his impression, the program at QRS was fundamentally similar to LKS. This is wrong for several reasons. While it is possible that C.D. could receive 1:1 attention at QRS by happenstance, i.e., if other students are absent, the Parent requested and the IEP team specifically denied 1:1 support for C.D. (Closing Br., 43; FCPS 50; Tr. 350:1-8). The Hearing Officer also mentions Accommodations, "such as relaxation of work requirements and toleration of mild disorderly conduct, such as cursing, crying, and eloping occurred at both schools." (Hearing Officer Decision p. 5). This is gross over-simplification of the intense behavioral and academic program provided by LKS, a therapeutic residential program for male students with autism spectrum disorders. (Tr. 44:9-14; 64:2-5). The Hearing Officer then places the blame on C.D. for

not receiving an education during the 2019-2020 school year: "It appears this Student is adamant about ending his studies once he loses interest. If he doesn't want to proceed, he won't." On the basis of these two "impressions" the Hearing Officer then determined that the IEPs proposed by FCPS during the 2019-2020 school year offered C.D. a FAPE. He does not consider C.D.'s needs according to his disabilities and whether or not FCPS's proposed IEPs adequately addressed them or whether QRS implemented C.D.'s IEP, all of which were addressed in the Complaints, Exhibits, and Testimony.

h.) The Hearing Officer did not consider C.D.'s current needs according to his disabilities and whether the May 2020 IEP addresses these in determining that FCPS offered FAPE for the 2020-2021 school year. Instead, he took portions of Dr. William D. Ling's testimony out of context to conclude that Dr. Ling was not in support of placement at the Glenholme School. In addition, the Hearing Officer misses the point that C.D. requires consistency across environments in order to make educational progress, which would include the home setting. He states "With the exception of providing the at home interventions . . . the proposed 2020-21 IEP matches Dr. Ling's recommendations." This is untrue. As Dr. Ling himself testified that the IEP was inadequate. The fact that C.D. requires that consistency in the "at home" and educational setting is why he requires a residential placement at the Glenholme School. The Hearing Officer then refers to C.D.'s "certain predilections towards extreme conduct", which has been an ongoing concern and one of the needs for which C.D. requires a more restrictive placement.

i.) Despite the evidence presented by C.D., the Hearing Officer seems to have relied solely on FCPS's filings and arguments; and has even misunderstood those. For instance, even though the Parent has systematically laid out their claims and evidence throughout the due process filings, the Hearing Officer failed to rule on them in his decision.

j.) In addition to the above specific factual and legal errors made by the hearing officer, numerous other misappropriations of witness testimony and documented evidence were made.

It is clear based on these facts that the Hearing Officer not only lacked a basic understanding of the actual claims and issues at stake in this due process but also selectively interpreted the language presented by both sides in an unreasonable manner. As such, the Hearing Officer's findings of fact were not "regularly made" and should not be granted deference under the law. In *J.P.*, the Fourth Circuit held that the Due Process Hearing Officer had not implemented the accepted norm of the fact-finding process. They found that despite the record, the Hearing Officer distorted facts and witness testimony and made no credibility determinations other than to state that the mother was biased. *J.P. v. County Sch. Bd. of Hanover County*, 447 F. Supp .2d 553, 564 (E.D. Va. 2006). Similar to J.P, the Hearing Officer in this matter had distorted facts and witness testimony, going so far as to alter the very issues of the case to match the school district's closing argument. It is exceedingly clear that the Hearing Officer was biased in this matter and his determinations should not be granted any deference.

**B. The School District Failed To Offer An IEP Reasonably Calculated To Provide A Free And Appropriate Public Education ("FAPE") To C.D. During The 2017-18, And 2018-19 School Years.**

**1. Failure to Offer An Appropriate IEP  Goals, Accommodations, Services and Placement For His Unique Needs According To His Disabilities During The 2017-2018 And 2018-2019 School Years.**

70.  While at LKS during the 2017-2018 school year, the IEPs proposed by FCPS had insufficient Goals, Accommodations, Services, and Placement. (See Appendix). The Parent repeatedly advocated for the IEP to reflect the level of service that the highly trained and specialized staff at LKS found C.D. needed. As LKS is a residential program, the staff were well-attuned to what C.D. needed in the educational and community settings. Upon attending LKS for approximately 4 months, the Parent were approached by Marc Columbus the Headmaster of LKS, who stated that C.D. was exhausting their counseling and behavioral support resources and required a dedicated one-on-one to access the educational environment. LKS stated in their April 20, 2017

letter "The 1:1 support is critical to help [C.D.] work towards his IEP goals and to adequately access the academic program." (Tr. 271:22-273:22, 1651:15-1653:17; Compl 3, 4, 105). This need continued during the 2017-2018 school year. In the March 12, 2018 letter from LKS Clinical Director Dr. Marty Thompson to the Parent he stated:

> [C.D.] continues to require intensive uninterrupted residential support for his emotional and social functioning, as well as successful completion of Activities of Daily Living including hygiene and basic health care. Despite continual medication management, and gains in emotional regulation, [C.D.] continues to misperceive social interactions, become overloaded with basic task exceptions, and struggle with sustained effort towards academic, social, and personal objectives."

(Compl. 6). He further emphasized that C.D. was progressing at a slower rate than his peers at LKS and that he still required the level of restrictiveness at LKS to function safely and make meaningful progress. (Id.). Despite this, FCPS's March 20, 2018 IEP did not contain one-on-one support, did not have a Behavior Intervention Plan, had only one goal in the area of self-regulation, and only three hours of counseling per month. (FCPS. 50). FCPS held fast to the three hours of counseling service per month without any rationale, other than to state that the three hours of counseling, combined with the public separate day school environment of Quander Road School and a yet-to-be-written and long-overdue BIP would be sufficient to address the significant needs documented throughout C.D.'s educational record. Interestingly, the Placement Rationale did support a private day placement, stating "[C.D.] requires the small, student-teacher ratio, individualized instruction, structure, and therapeutic supports of a ***private day school*** to progress in the general education curriculum." (Emphasis added). (FCPS 50-041). As stated above, LKS implemented the FCPS IEP goals, accommodations, and services, with seven additional academic goals, 10 additional OT goals, four additional long-term speech language goals, with 22 short-term objectives. (Compl. 19-21). The seemingly dispensable (according to FCPS) one-on-one attention is exactly what the Director at LKS cites as integral to C.D.'s success.  FCPS's proposed

placement's for C.D. have always supported the idea that he would be successful in the public school system without any evidence to support this determination.

71.  C.D.'s needs were so great that the highly skilled staff of the Ivymount School recommended a residential level of placement in 2016. They provided data to support this conclusion and had shared this information with the Parent, derailing their hope that C.D. would be able to attend Mount Vernon High School. As described by Monica Werner, Jennifer Engle, and Dr. Steven Kane from Ivymount, the increase in task demand and changes experienced by C.D. during the 2015-2016 school year resulted in regular issues with uncontrolled emotionality and a risk of physical aggression. (Tr. 202:16-205:16, 207:10-218:15; Compl. 103, 116). From the very start, despite the Ivymount data and strong recommendation for residential placement to address C.D.'s intertwined needs, FCPS members of the IEP team rejected the recommendation without any basis and determined Quander Road School in FCPS as C.D.'s placement. (Tr. 321:5-323:14). From this point on, regardless of the data and evidence by those educating and providing services throughout the day and the evaluations and recommendations of multiple experts, FCPS maintained that Quander Road was appropriate.

72.  As stated above, following the determination by Ivymount that they could not meet C.D.'s needs, the Parent enrolled C.D. in LKS with the intention to seek tuition reimbursement from FCPS. LKS is a private therapeutic boarding school for boys with social and learning differences and emotional difficulties, from the 4th through 12th grades. (Tr. 64:2-64:5). LKS is accredited by the Virginia Association of Independent Specialized Education Facilities and licensed by the Virginia Department of Education as a special education private residential school. It is not a medical facility and does not provide treatment; although within the context of their program, they do provide psychiatric care. LKS enrollment is limited to 35 male students who can be placed there through the IEP process. LKS is fully capable of implementing an IEP, and did so in C.D.'s case, although they also provided additional goals, accommodations, and

services which C.D. required but were not in C.D.'s FCPS IEP. (Tr. 64:6-67:1; Compl. 3, 4).

73.  As reported by Ivymount and LKS and testified to by the Parent, C.D.'s manifestations of his disabilities and resulting emotional outbursts and behaviors significantly interfered with his access to an education. (Tr. 345:17-346:19; Compl. 3, 4, 6, 12, 103, 105, 116; FCPS 52). C.D.'s behaviors from 2016-2019 occurred in response to basic requests and included ". . . yelling, cursing, arguing, crying, walking out of supervision and often required one-on-one support away from the group. While highly upset or agitated and out of class, LKS support staff provided [C.D.] with the following strategies and supports within the framework of LKS's therapeutic environment:

- Allow to take space away from the group
- Allow to listen to music
- Movement break (walking or basketball)
- Very little verbal interaction
- Switch to staff to offer different perspectives
- Offered preferred tasks for a set period of time (ex. Coloring, reading)
- Reflective listening
- Allow a quick nap/rest (10-15 minutes)
- Allow time and space to drain off emotions (allowing him to speak uninter-rupted to get his thoughts off

74.  All of the strategies listed above were implemented in a one-on-one setting with a support counselor or other support staff member." The LKS documents also show that C.D. gained skills during his time at LKS and increased his tolerance for the classroom environment and for participating in instruction and classroom discussions. (Compl. 15-23). LKS noted that C.D.'s ability to progress academically was directly related to his emotional state and as he made progress in the therapeutic environment, C.D. grew more engaged and able to complete assign-ments. (Tr. 19:14-26:20; Compl. 1-016, 23, 30-004). Here we see that in his Final Decision and Order the Hearing Officer failed to take into regard the environment nature of the improvement made by C.D. Instead, the Hearing Officer only took into account the progress C.D. made as a means of stating he no longer required the individualized support he was receiving. At the same

time, the Hearing Officer did not take this progress as a representation that the placement made by the Parent was appropriate and educationally necessary. This kind of internal inconsistency in favor of the school district is present throughout the Hearing Officer's Final Decision and Order.

### 2. Failure to Properly Fund C.D.'s Residential Placement for the 2017-18 and 2018-19 School Years.

75.   In this case, C.D.'s emotional, psychiatric, social, speech, mental, and educational needs are so intertwined that it is nearly impossible for him to make meaningful progress in one area without focusing on the whole. As Dr. Ling stated in his testimony, "given the fact that a lot of [C.D.'s disabilities] are interacting together, in order for substantive gains to be made, you have to address all of them in kind of a concerted fashion." (Tr. 705:12-17). As stated above, prior to his enrollment at LKS, C.D. had unsuccessfully attended both The Newton School and Ivymount. Neither special education specific program had the resources necessary to manage C.D.'s mix of problematic, aggressive, behaviors, mental and emotional breakdowns, eloping, and outright work refusal. This culminated in his being asked to leave the Ivymount program with a specific recommendation that he seek support in a residential setting for both academic and emotional needs.

76.   From the beginning of his time at LKS, C.D. severely struggled with getting acclimated to their program. According to LKS staff, it took approximately his entire first year to develop the skills necessary to merely remain in the classroom on a consistent basis. Initially, when presented with any demands or requests for activity, C.D. would elope from the classroom, walk out of the school building, and play with the rocks located in parking lot of LKS. This process could initially take hours to coax him back into the school environment. In addition to his eloping behaviors, C.D. also initially presented with verbal and physical abusive behaviors. On a few occasions this required the use of physical restrain to protect others and himself. (Tr. 146:6-146:21). Over approximately two years, LKS staff, through the use of direct one-on-one work

and consistent messaging across environments, managed to get C.D. to first reduce his elopement durations and then their distance. By C.D.'s final year at LKS, he was able to consistently remain in classroom even when presented with non-preferred tasks, although work completion was still a major issue.

### 3. Failure to Reimburse the Parent for Educational Expenses to Related to C.D.'s Enrollment  at LKS.

77.  Even if FCPS is found to be correct in their determination that C.D.'s placement at LKS was for non-educational reasons, federal law still requires that all special education services must be provided at no cost to Parent. Therefore, no co-payment may be charged to a parent for any service specified on the IEP or otherwise provided as a requirement of a free appropriate public education. For a student with a disability placed into a residential program for non-educational reasons (e.g., through a parental placement), the educational portion of the placement is exempt from the parental co-payment. *Community Services Act 9.1.5.*

## C. The School District Failed To Offer An IEP Reasonably Calculated To Provide A Free And Appropriate Public Education ("FAPE") To C.D. During The 2019-2020 School Year.

### 1. The Failure of The IEP Goals, Accommodations, Services, And Placement IN the IEPs Developed During the 2019-2020 School Year To Meet C.D.'s Needs According to His Disabilities.

78.  The Parent agreed to send C.D. to Quander Road School during the 2019-2020 school year in good faith. However, it became clear from the first IEP meeting that C.D.'s needs according to his disabilities continued to be minimized by the FCPS members of the IEP team. During IEP meetings held on August 15, 2019, October 31, 2019, December 12, 2019, January 30, 2020, and February 19, 2020, the Parent expressed their continued concerns that C.D.'s placement at Quander Road was not suitable for his needs according to his disabilities. (Compl. 104A-E). The Parent felt that his deficits in speech language, auditory processing, social-emotional, self-regulatory, and executive functioning were not adequately addressed in the IEP.

(Compl. 104B at 42:15, 45:00, 1:13:00; 104C at 39:45). They also felt that the implementation of the IEP within the environment of Quander Road School was insufficient to address his needs (Compl. 104B at 1:07:40, 1:34:15; 104C at 1:40:10). For example, homework was not regularly assigned, nor agendas utilized, and all educational materials and laptop computers remained in the Quander Road building, resulting in a lack of opportunities for C.D. to work on executive functioning (Compl. 104A at 10:20, 104B at 1:17:08; 104C at 39:30, 42:25). The Parent also expressed concern that important life skills such as managing finances and cooking and other areas of deficit were not addressed as the structure of Quander Road School precluded such opportunities (Compl. 104A at 21:20, 26:18; 104B at 1:34:45; 104C at 1:40:45). C.D. expressed that he felt he was regressing in his speech language and communication skills. (Compl. 104B at 36:10, 40:55, 42:55, 47:35; 104C at 21:45). C.D.'s refusal to work and cooperate with teachers and therapists was often mentioned, as well as increasing levels of emotional dysregulation in the home and school, to include physically assaulting his brother and punching a large hole in the wall of his bedroom. These aggressive behaviors were exhibited by C.D. during the 2016-2018 school years at LKS but had largely been extinguished by the end of C.D.'s enrollment at LKS in 2019. (Compl. 104A at 2:25, 11:20, 104B at 30:04, 50:45, 1:20:15, 1:22:35; 104C at 22:17, 1:03:59). Despite this, FCPS removed IEP Goals in the areas of executive functioning, reading, writing, and social skills before C.D. mastered the skill and did not provide adequate Speech Language services for C.D. to receive a meaningful benefit. (See Appendix).

79.  The Parent' concerns were supported by Dr. Ling who found that C.D. continues to demonstrate unstable functioning capacity associated with autism spectrum disorder despite the years of intervention. He stated that C.D.'s overall neurocognitive functioning in areas such as cognition and academic achievement was to be expected for his age, but that there was a marked contrast the capacity to subscribe to behavioral interventions over time. (Compl. 33). Dr. Ling emphasized in his testimony that these were all impacted by C.D.'s presence on the Autism

Spectrum with the associate mental rigidity and instability of functioning and response as well as his emotionally-based impulsivity. (Tr. 683:15-684:11). Dr. Ling observed that while C.D. has the capability to present as functioning well, there is an underlying disorganization and difficulty as a result of his Autism Spectrum Disorder and comorbid conditions that result in an immature presentation in which C.D. struggles with impulse control, emotional regulation and disorganized behavior. (Tr. 685:2-21). Dr. Ling stated C.D. requires long-standing participation in services and recommends supportive services to facilitate C.D.'s improvement in functional behavior and life skills. He observed that the only program that has had success addressing this area and C.D.'s ability to attend to and transition between tasks and make progress towards independent level of functioning was LKS. (Tr. 687:7-689:11, 692:3-8).

> **2. Failure Of The Temporary Learning Plan FCPS Implemented Despite The Parent' Disagreement During The 2019-2020 School Year To Meet C.D.'s Needs According To His Disabilities.**

80. The FCPS Temporary Learning Plan ("TLP") dated May 3, 2020, was unilaterally implemented without parental consent through the end of the school year. The TLP contained very few goals, accommodations, and services for C.D.'s many needs. (See Appendix). The Parent shared their concerns with C.D.'s deterioration during distance learning, as C.D.'s behaviors were worsening and he was experiencing suicidal ideation and high levels of frustration and agitation with the virtual platform. (Tr. 545:12). While FCPS may want to state that the TLP is NOT an IEP, that does not change the fact that the items in the TLP are derived directly from the student's IEP, and the services within the document were provided solely by C.D.'s special education teachers and related service providers. (See Appendix, FCPS 137). It is disingenuous to tell a student and their family that the school will be implementing a fraction of the student's IEP, but that somehow it is NOT an IEP. If a school district states they intend to provide services during the school year, it follows that the services are necessary due to the student's needs according to their disabilities. There is only one vehicle by which a student

eligible under the IDEA is provided these special education and related services. Therefore, the

TLP should be viewed as the IEP for the students who were forced to participate in the distance

learning environment, and the implementation of the TLP without the Parent' consent should be

viewed as a violation of the IDEA. 8VAC 20-81-170(E). (FCPS 137, 138).

### C. The School District Failed to Offer An IEP Reasonably Calculated To Provide A Free And Appropriate Public Education ("FAPE") To C.D. For The 2020-2021 School Year.

#### 1. Failure to Propose Appropriate IEP Goals, Accommodations, and Services For the 2020-2021 School Year

81. During the May 2020 IEP meetings, the Parent repeated their requests for IEP goals

to address C.D.'s deficits in the areas of Auditory Processing, Speech Language, Reading,

Writing, Budgeting, Self-Presentation, and Life Skills. (Compl. 104G-H). FCPS members of the

IEP team denied the need for any auditory processing or academic goals. They stated that they

felt C.D. had met Virginia state requirements in reading and writing despite the discussion

regarding his very low scores on the writing portion of the KTEA indicating that he was below

average and evidence provided by Quander Road teachers and the Parent that illustrated C.D.

had regressed in the area of writing. The Parent also raised concerns with the level of academic

rigor and pacing, and that the curriculum at Quander Road during the 2019-2020 school year did

not meet the Virginia Standards of Learning.

#### 2. Failure to Propose and Appropriate Placement For the 2020-2021 School Year

82. The IDEA regulations state that a district must provide a residential placement to a

student with a disability at no cost to the Parent if such a placement is necessary to provide the

student with special education and related services. 34 CFR 300.104. Thus, a district's duty to

offer a residential placement turns on whether the student requires a residential placement to

receive FAPE. Although no one test determines whether a residential placement is appropriate, one court identified nine factors that districts should consider in determining whether a residential placement provides an appropriate education in the student's LRE, incorporating elements of many other tests previously used by courts and hearing officers:

1.  **Inclusion efforts**: Consider the steps the school district has taken to try to include the child in a special class within a regular or local community-based school setting ("a local placement"), including curriculum, supplementary services, and mainstream opportunities.

2. **Comparison of likely benefits**: Compare the educational benefits the child will receive in the local placement (with supplementary aids and services) to the educational benefits the child will receive in the more segregated setting of a residential placement.

3. **Mainstreaming effects**: Consider the possible effects the child's inclusion may have on the education of the other students in the local placement class and in the school.

4. **Physical or emotional conditions**: Determine if the child was experiencing physical or emotional conditions, which fundamentally interfered with the child's ability to learn in a local placement.

5**. Behavior or regression**: Assess whether the child's behavior was so inadequate, or whether regression was occurring to such a degree, as to fundamentally interfere with the child's ability to learn in a local placement.

6. **Prior assessments**: Ascertain, before the dispute arose, whether any health or educational professionals actually working with the child concluded that the child needed residential placement for educational purposes.

7. **Potential**: Determine if the child has significant unrealized potential that only can be developed in a residential placement.

8. **Past experience**: Review past experience to see if a need for residential placement was established.

9. **Purpose of placement**: Consider whether the demand for residential placement is primarily to address educational needs.

*D.B. v. Ocean Twp. Bd. of Educ*., 27 IDELR 151 (D.N.J. 1997). All of the above nine separate considerations identified by the courts support the position that C.D. requires a residential placement for the 2020-2021 school year.

      **3.  The Glenholme School Has The Level Of Services and Programming To Meet C.D.'s Needs According To His Disabilities.**

83.  C.D. clearly requires a more restrictive placement due to the intertwined nature of his Autism Spectrum Disorder, ADHD, Other Specific Neurodevelopmental Disorder (due to documented deficits in executive functioning), Language Disorder (resulting in deficits in verbal sequencing, auditory working memory span and oral pragmatics), Disruptive Mood Dysregulation Disorder, Depression, General Anxiety Disorder, Bi-Polar Disorder, Dyslexia, Phonological Disorder, and Auditory Processing Disorder. As Dr. Ling noted in his report and testimony, C.D. is a student whose functioning in areas such as cognition and academic achievement was to be expected for his age, but that there was a marked contrast with other significant areas of functioning in which C.D. remains deficient despite YEARS of interventions. (Tr. 677:21-678:7). Dr. Ling emphasized in his testimony that these were all impacted by C.D.'s presence on the Autism Spectrum with the associate mental rigidity and instability of functioning and response as well as his emotionally-based impulsivity. (Tr. 683:15-684:11). Due to these and other issues in the areas of executive functioning, speech language, auditory processing and OT, C.D. requires a consistent learning environment 24 hours a day, 7 days a week ("24/7"), rather than a day school program. Dr. Ling stated that C.D. requires a focused and structured intensive program similar to what he had while a student in the residential setting of LKS, to include one-on-one support. (Tr. 726:4-22). Dr. Ling stated that day school would be insufficient for him to gain the intensity of intervention, as C.D. needs 24/7 support to provide that intensity of intervention across environments to make meaningful gains in his education and to begin to generalize skills across different modalities and environments. (Tr. 726:22-728:4, 791:7-792:9). He further stated that while neurocognitively C.D. should be able to achieve the same goals as his peers, due to the severity and intensity of C.D.'s disability, his functioning is much more limited. (Tr. 788:7-789:1). He stated in his testimony: "I think that [C.D.] is in a very, very small subgroup, that he is very singular in the fact that he really is very high functioning, he has appropriate cognitive capacities, but that

the behavioral parameters that are associated with him being on the autistic spectrum have just such a significant impact on him in a very particular way." (Tr. 790:6-791:6). Due to C.D.'s unique and intertwined needs according to his disabilities, he requires the more restrictive environment available at the Glenholme School

84.  The Glenholme School is a special needs boarding school designed to meet the needs of students like C.D. whose disabilities include high functioning autism disorders, ADHD, OCD, Tourette's, Depression, Anxiety, and various learning disorders. (Compl. 96). In addition to academic curriculum for middle to high school students, Glenholme also has a transition program for students aged 18-21. The academic program curriculum includes Language Arts, Mathematics, Social Studies, Science, World Languages. Fine Arts, Physical Education and Health, Electives, Executive Function Skills and Advanced Placement Coursework. The Transition program includes independent living, Executive Function, Personal Finance and Consumer Awareness, Career Readiness and Employability, Workplace Technology, Interpersonal Dynamics, Personal Health and Wellness, and Life Skills. (Id.). The program also includes clinical and social support with a focus on generalization of skills with built-in mentoring and monitoring for each student's progress in their areas of need and to build independence. (Id.).

85.  During the transition discussion with LKS regarding C.D's next educational placement at the end of the 2018-2019 school year, the Parents considered placement the Glenholme School as a next step for C.D. This was based upon the input from LKS and an educational consultant. (Tr. 512:22-516:13). The Parents and C.D. toured the school, but ultimately decided to try Quander Road School in FCPS. (Tr. 517:8-525:1). By the end of the 2019-2020 school year, C.D. had regressed in his social-emotional functioning and his mental health also became a larger issue, in addition to the continuing concerns outlined above with regard to C.D.'s academics, executive functioning, lack of goals and services to address his auditory processing disorder, and insufficient goals and services to address his speech language needs. After the disappointing

May 2020 IEP meetings, that Parents consulted with various experts to include LKS staff, Dr. Ling, Dr. Lucker, C.D.'s other treating doctors and decided to reach out to Glenholme again to see if it was still even an option for C.D. (561:10-563:20). Over the summer of 2020, Glenholme contacted LKS and also spoke with Dr. Ling, in addition to the discussions with the Parents, regarding C.D.'s current needs according to his disabilities. They agreed that Glenholme would be an appropriate placement for C.D. (Tr. 560:3-562:21). On July 18, 2020, the Parents signed the May 26, 2020 IEP in disagreement and provided FCPS with timely notice of their intent to withdraw C.D. from FCPS and to enroll him at the Glenholme School at public expense. (Compl. 106).

86.   C.D. has lost a year of educational progress while at Quander Road. As a result, he has regressed in key areas of need, to include speech language, articulation, writing, executive functioning, social-emotional functioning and his mental health has been impacted. Placement at Glenholme should be viewed not only as C.D.'s least restrictive environment and placement that addresses his needs according to his disabilities,  but also as a compensatory educational measure.

87.   C.D. turned 20-years-old on November 17, 2020. There is now a sense of urgency for this young man to be able to make meaningful educational progress in order to have the opportunity towards some level of independence and employment in life. His needs are many and are intertwined and very unique in presentation. FCPS has failed to acknowledge all of C.D.'s needs and the intensity of those needs since 2016. They have had numerous opportunities to make a course-correction but have failed to understand or minimized the severe impact his disabilities have had on his access to an education. C.D.'s IEP placement should be Glenholme and it would also serve as a compensatory education service due to the intensity of the interventions available in Glenholme's 24/7 educational setting.

### III.  CONCLUSION

As stated, FCPS has denied and continues to deny C.D. a Free and Appropriate Public Education.  Therefore, C.D.  respectfully requests the following relief from the Court:

1. A reversal of the Hearing Office's Final Decision and Order;

2. A determination that the IEPs proposed on and since March 20, 2018 were not reasonably calculated to offer C.D. a FAPE and that residential school placement at Little Keswick School was the appropriate IEP placement for C.D. during the 2017-2018 and 2018-2019 school years;

3. A determination that the 2019-2020 IEP did not contain adequate and/or appropriate IEP Transition Services, Goals, Accommodations, Services, and Placement to address C.D.'s needs according to his disabilities and that a new IEP should be developed that incorporates the recommendations made by Dr. Lucker and Dr. Ling;

4. Reimbursement for the full fees and expenses incurred by the Parents to effectuate C.D.'s enrollment and special education services from March 20, 2018 through the end of the 2018-2019 school year at the Little Keswick School, to include 1:1 services, counseling, speech, OT, education, boarding, travel expenses, etc.;

5. A determination that the IEP proposed on May 26, 2020, fails to offer a FAPE, and that C.D. requires a placement at the Glenholme School specializing in students with Autism Spectrum Disorders and other co-morbid conditions and their transition from high school to college/career;

6. Reimbursement for any tuition and expenses paid by the Parent for C.D.'s enrollment at the Glenholme School the 2020-2021 school year; and;

7. The Parent reserves the right to seek reasonable attorneys' fees under the IDEA as part of the costs of this action; And

**8.** Any other relief the Court deems appropriate.

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of January 2021, I will electronically file the foregoing with the Clerk of County using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

John Cafferky, Esquire
Melissa Little, Esquire
c/o Blankingship & Keith, P.C.
4020 University Drive, Suite 300
Fairfax, VA 22030
jcafferky@bklawva.com
mlittle@bklawva.com

_____/s/_____
Grace E. Kim, Esquire
VSB No. 87010
Attorney for the Plaintiffs
LAW OFFICE OF GRACE E. KIM, PC
11325 Random Hills Road, Suite 360-110
Fairfax, Virginia 22030
Phone: (703) 225-3395
Fax:    (703) 225-3333
gekim@gekimlaw.com